UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WAG SPV I, LLC,

Plaintiff,

-v.-

FORTUNE GLOBAL SHIPPING & LOGISTICS,
LTD; FORTUNE GLOBAL SHIPPING &
LOGISTICS (USA), INC.; and ERIC OPAH,

Defendants.

19 Civ. 6207 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

Plaintiff WAG SPV I, LLC brings this action against Defendants Fortune

Global Shipping & Logistics, Ltd. ("FG Nigeria"), Fortune Global Shipping &

Logistics (USA), Inc. ("FG USA"), and Eric Opah (collectively, "Defendants") for

attachment of Defendants' assets in the Southern District of New York.

Plaintiff alleges that Defendants have wrongfully arrested its vessel, SEA

HORIZON, in the Republic of Ghana, and have failed to post any security for

that arrest despite an order to do so from a court in Ghana. Plaintiff has

obtained — and seeks to maintain — its attachment of Defendants' assets as

security for the Ghana court's order and Plaintiff's own wrongful arrest claim.

Defendants have moved pursuant to Federal Rule of Civil Procedure

Supplemental Rule E(4)(f) to vacate this Court's prior Order of Maritime

Attachment and Garnishment or, in the alternative, transfer this action to the

Southern District of Texas. For the reasons set forth in the remainder of this

Opinion, Defendants' motion to vacate is granted, and its motion to transfer is

denied as moot.

**BACKGROUND**

**A.    Factual Background**[1]

**1.    The Parties**

Plaintiff is a Texas limited liability company based in Dallas, Texas, and is the current owner of the heavy lift pipe-laying vessel DLB SEA HORIZON ("SEA HORIZON").  (SAVC ¶ 2).  Plaintiff purchased SEA HORIZON on or about November 22, 2016.  (*Id.* at ¶ 7).  Defendant FG Nigeria is a Nigerian company based in Lagos State, Nigeria, while FG USA is a Texas corporation based in Houston, Texas.  (*Id.* at ¶¶ 3-4).  Defendant Opah resides in Humble, Texas, and is the President, CEO, Director, and Founder of both FG Nigeria and FG USA.  (*Id.* at ¶ 5).  Plaintiff alleges that FG Nigeria and FG USA share common ownership, common directors, a single website, and a common LinkedIn page. (*Id.* at ¶¶ 44-45).

**2.    FG Nigeria's Ghana Proceedings**

On or about September 18, 2018, FG Nigeria filed an *ex parte* application in Ghana (the "Ghana Action") for the arrest and detention of SEA HORIZON. (SAVC ¶ 8).  In it, FG Nigeria alleged that Ranger Subsea Nigeria Limited ("RSNL"), a Nigerian company operating out of Houston, Texas, was indebted to

---

[1]    The facts in this Opinion are drawn primarily from Plaintiff's Corrected Second Amended Verified Complaint ("SAVC" (Dkt. #36)), which is the operative pleading in this case.  For facts outside the SAVC, the Court draws from the parties' briefing and their submitted declarations, including the Declaration of James C. Winton ("Winton Decl." (Dkt. #42)); the Declaration of Kim DeLong ("DeLong Decl." (Dkt. #50)); and the Declaration of Eric Opah ("Opah Decl." (Dkt. #54)).

For ease of reference, the Court refers to Defendants' opening brief as "Def. Br." (Dkt. #41); Plaintiff's opposing brief as "Pl. Opp." (Dkt. #58); and Defendants' reply brief as "Def. Reply" (Dkt. #64).

2

it for approximately $1.9 million under the terms of a Master Service Agreement ("MSA"). (*Id.* at ¶¶ 9-10). In order to recover its debt, FG Nigeria brought the Ghana Action against, *inter alia,* RSNL, Plaintiff, and SEA HORIZON, contending that RSNL, Plaintiff, and other entities were joint owners of SEA HORIZON and thus jointly and severally liable for RSNL's debt. (*Id.* at ¶ 13). This is so despite the facts that (i) the MSA mentions neither Plaintiff nor SEA HORIZON, and (ii) according to Plaintiff, FG Nigeria never performed work for the benefit of Plaintiff or SEA HORIZON. (*Id.* at ¶ 11). RSNL likewise never contracted with FG Nigeria on Plaintiff's behalf. (*Id.*).

On September 20, 2018, the Ghana court issued an order for SEA HORIZON's arrest. (SAVC ¶ 14). In October 2018, Plaintiff moved the Ghana court to set aside the order arresting SEA HORIZON, claiming that Plaintiff and SEA HORIZON had no dealings with FG Nigeria. (*Id.* at ¶ 15; *see also id.*, Ex. 3 at 4-9). The Ghana court refused to vacate the order. (*Id.* at ¶ 17).

On January 25, 2019, Plaintiff requested that the Ghana court order FG Nigeria to post a security for any costs for which it may potentially be liable. (SAVC ¶ 25). Plaintiff also applied for an order requiring FG Nigeria to provide documents or evidence supporting its claims against SEA HORIZON. (*Id.* at ¶ 20). In response, the Ghana court issued an order on February 28, 2019, requiring FG Nigeria to provide "Further and Better particulars together with the invoices, receipts[,] and other documents in relation to [FG Nigeria's] claims" by March 14, 2019. (*Id.* at ¶¶ 20-21). The Ghana court also ordered FG Nigeria to post a security of $400,000. (*Id.* at ¶ 26).

FG Nigeria did not respond to the Ghana court's order regarding submitting further evidence in support of its claims until April 26, 2019, at which time it filed a supplementary affidavit. (SAVC ¶ 22). By that time, SEA HORIZON had applied to the Ghana court for release. (*Id.* at ¶ 23). On May 3, 2019, SEA HORIZON filed a supplementary affidavit in support of its release, noting that a review of FG Nigeria's supplementary affidavit indicated that FG Nigeria had provided approximately $55,000 in services to SEA HORIZON. (*Id.* at ¶ 24). That amount was far lower than the almost $2 million that FG Nigeria claimed in damages. (*Id.* at ¶¶ 10, 24). In regards to the Ghana court's order that FG Nigeria post a $400,000 security, FG Nigeria has yet to comply. (*Id.* at ¶ 27).

On May 24, 2019, the Ghana court ordered that SEA HORIZON be released. (SAVC ¶ 28). However, FG Nigeria applied for a stay of execution of the release order. (*Id.*). When that application was denied, FG Nigeria appealed the denial. (*Id.*). On July 8, 2019, the appeals court in Ghana dismissed FG Nigeria's appeal. (*Id.*).

### 3. The Other Ghana Proceedings

On or about May 30, 2019 — subsequent to the original Ghana court's order that SEA HORIZON be released — SJ Abed General Enterprises Ltd. ("SJ Abed"), a Nigerian entity, filed for an order of arrest and detention against SEA HORIZON in a different court in Ghana. (SVAC ¶¶ 33-34). Like FG Nigeria, SJ Abed claimed to be owed money for services provided pursuant to a Master Services Agreement. (*Id.* at ¶ 36). On or about June 27, 2019, Hercules

Marine Limited ("Hercules Marine"), another Nigerian entity, filed an order of arrest and detention against SEA HORIZON in a third, different court in Ghana. (*Id.* at ¶¶ 39-40). Hercules Marine also claimed to be owed money under a Master Services Agreement. (*Id.* at ¶ 41). In all three arrest actions, the three applicants — FG Nigeria, SJ Abed, and Hercules Marine — were represented by Dr. Kofi Mbiah, a solicitor with Alliance Partners. (*Id.* at ¶¶ 30, 35, 41).

Plaintiff alleges that Defendants, with the assistance of Dr. Mbiah, "have orchestrated the SJ Abed and Hercules Marine arrest actions in a malicious and bad faith attempt to deplete Plaintiff's resources, with reckless disregard for Plaintiff's legal rights." (SAVC ¶ 43). Plaintiff claims that, because of SEA HORIZON's arrest, it has been unable to sell, employ, or charter its vessel, losing thousands of dollars per day. (*Id.* at ¶ 54). Additionally, Plaintiff has incurred port fees and other expenses at a rate of approximately $250,000 per month. (*Id.*). At the time of the SAVC, Plaintiff believed that it had incurred not less than $2.5 million in damages, exclusive of interest, costs, and attorney's fees. (*Id.*).

### 4. The Texas Proceedings

On May 6, 2019, Plaintiff filed suit against Defendants in the Southern District of Texas, asserting a claim under Supplemental Rule D. (*WAG SPV I, LLC* v. *Fortune Global Shipping & Logistics (USA), Inc.*, No. 4:19-cv-1653 (S.D.

Tx.), Dkt. #1).[2] The complaint in that case alleged much the same facts, and asked the Texas court, pursuant to Supplemental Rule D, to issue a judgment both declaring Plaintiff to be the sole owner of SEA HORIZON and awarding Plaintiff at least $4.2 million in damages. (Dkt. #1 (original complaint); Dkt. #4 (amended complaint filed May 24, 2019)). On June 21, 2019, Defendants moved to dismiss Plaintiff's complaint under Rule 12(b)(1), for lack of subject matter jurisdiction, and under Rule 12(b)(2), for lack of personal jurisdiction over FG Nigeria. (Dkt. #7). Plaintiff amended its complaint a second time on July 29, 2019 (Dkt. #19), and Defendants answered on August 9, 2019 (Dkt. #27). Defendants' answer contained a number of affirmative defenses, including lack of subject matter jurisdiction, lack of personal jurisdiction over FG Nigeria, and *forum non conveniens*. (Dkt. #27). On February 17, 2020, at Plaintiff's instigation, the parties stipulated to a voluntary dismissal without prejudice of the action in Texas. (Dkt. #59). The Texas action was dismissed the following day, on February 18, 2020. (Dkt. #60).

## B. Procedural Background

Plaintiff initiated the instant action on July 3, 2019, with the filing of a complaint seeking attachment pursuant to Supplemental Rule B. (Dkt. #1). That same day, the Court issued an Order directing the Clerk of Court to issue process of maritime attachment and garnishment against all tangible and intangible property belonging to Defendants at Deutsche Bank, Standard New

---

[2] Docket entry references in the remainder of this paragraph are to the docket in the Texas action, of which docket the Court takes judicial notice.

York, Inc., and Wells Fargo Bank N.A., up to the amount of $2.9 million. (Dkt. #3). On July 10, 2019, Plaintiff filed a first amended complaint (Dkt. #7), in response to which the Court issued a second order of attachment and garnishment (Dkt. #11). On July 17, 2019, the Court issued a third order of attachment and garnishment, this time noting that "any person claiming an interest in any property attached or garnished ... shall ... be entitled to a prompt hearing at which the Plaintiff shall be required to show why the attachment and garnishment should not be vacated." (Dkt. #14). On July 19, 2019, Plaintiff asked the Court for leave to file a second amended complaint (Dkt. #15), which the Court granted the same day (Dkt. #16). Plaintiff filed its second amended complaint on July 19, 2019. (Dkt. #32).

On July 22, 2019, the Court scheduled an initial pretrial conference for October 17, 2019. (Dkt. #17). However, on July 24, 2019, Defendants filed letters with the Court requesting leave to file motions to vacate the attachment order and to transfer the case to the Southern District of Texas. (Dkt. #20-21). Defendants also informed the Court of the parallel proceeding in Texas, of which the Court had, until that point, been unaware. (Dkt. #21). The Court expressed concern that Plaintiff had withheld material information concerning this parallel proceeding, and ordered Plaintiff to file a letter by July 26, 2019, explaining the status of the Texas action and why that action had not been disclosed to the Court, among other things. (Dkt. #22). Plaintiff responded by letter on July 26, 2019 (Dkt. #25), but the Court found itself dissatisfied with Plaintiff's response and determined that a conference was necessary to provide

further clarity (Dkt. #26). The Court ordered the parties to appear for a pre-motion conference on August 15, 2019. (*Id.*).

On August 5, 2019, Defendants filed an answer to the second amended complaint (Dkt. #30), and on August 12, 2019, they filed an amended answer to that complaint (Dkt. #33). On August 15, 2019, the parties appeared before the Court for the pre-motion conference, at which time the Court set a briefing schedule for Defendants' motions. (Minute Entry for August 15, 2019). On August 21, 2019, the parties stipulated to Plaintiff filing the SAVC, as well as Defendants refiling their answer to that complaint. (Dkt. #35). Plaintiff filed the SAVC, which is the operative pleading in this action, on August 22, 2019 (Dkt. #36), and Defendants filed their operative Answer on August 28, 2019 (Dkt. #37).

Defendants FG USA and FG Nigeria filed their combined motion to vacate the attachment and to transfer the case, along with an accompanying memorandum and declarations, on September 16, 2019. (Dkt. #40-50). Defendant Opah filed an Answer and a notice of his intent to join his co-defendants' motions, as well as a memorandum and declaration, on September 25, 2019. (Dkt. #51-54). Plaintiff filed its opposing papers on October 18, 2019. (Dkt. #58-60). Defendants filed their reply papers on November 1, 2019. (Dkt. #64-68).

On February 18, 2020, Defendants informed the Court that the Texas action had been dismissed without prejudice. (Dkt. #75). However, both parties informed the Court of their views that the dismissal of the Texas action

would not affect the Court's analysis of the pending motions to vacate and transfer.  (Dkt. #76-78, 80).

**DISCUSSION**

**A.   The Court Vacates Its Prior Orders of Attachment**

   **1.   Applicable Law**

Plaintiff has brought this action pursuant to Supplemental Rule B(1)(a), which provides that "if a defendant is not found within the district," a plaintiff may file a verified complaint containing "a prayer for process to attach the defendant's tangible or intangible personal property — up to the amount sued for — in the hands of the garnishee name in the process."  Fed. R. Civ. P. Supp. B(1)(a).  Attachment is a remedy in admiralty because "it is frequently … more difficult to find property of parties to a maritime dispute than of parties to a traditional civil action," since "[m]aritime parties are peripatetic, and their assets are often transitory."  *Aqua Stoli Shipping Ltd.* v. *Gardner Smith Pty Ltd.*, 460 F.3d 434, 443 (2d Cir. 2006), *abrogated on other grounds by Shipping Corp. of India* v. *Jaldhi Overseas Pte Ltd.*, 585 F.3d 58 (2d Cir. 2009).  Thus, attachment exists in order to remove the need for a plaintiff "to scour the globe to find a proper forum for suit or property of the defendant sufficient to satisfy a judgment."  *Id.*

Defendants, in turn, have moved to vacate the order of attachment pursuant to Supplemental Rule E(4)(f), which provides that "[w]henever property is arrested or attached, any person claiming an interest in it shall be entitled to a prompt hearing at which the plaintiff shall be required to show

why the arrest or attachment should not be vacated." Fed. R. Civ. P. Supp. E(4)(f).  A district court must vacate the attachment if a plaintiff fails to show that (i) it has a valid *prima facie* admiralty claim[3] against the defendant; (ii) the defendant cannot be found within the district; (iii) the defendant's property may be found within the district; and (iv) there is no statutory or maritime law bar to the attachment.  *Aqua Stoli*, 460 F.3d at 445.  Additionally, a district court *may* vacate an attachment if a defendant shows, *inter alia*, that (i) the defendant is subject to suit in a convenient adjacent jurisdiction; or (ii) the plaintiff could obtain *in personam* jurisdiction over the defendant in a district where the plaintiff is located.  *Id.*

---

[3]     In general, "the majority of courts in this district have held that the standard for determining whether a plaintiff has asserted a 'valid prima facie admiralty claim' is the 'prime facie standard' rather than the more demanding 'fair probability' or 'reasonable grounds' standard."  *Padre Shipping, Inc.* v. *Yong He Shipping*, 553 F. Supp. 2d 328, 331-32 (S.D.N.Y. 2008); *but see Louis Dreyfus Co. Freight Asia Pte LTD* v. *Uttam Galva Metallics Ltd.*, 256 F. Supp. 3d 509, 512 (S.D.N.Y. 2017) ("[A] plaintiff seeking to defend an *ex parte* order of maritime attachment entered in its favor must show that reasonable grounds for the attachment exist.").  The *prima facie* standard is lower, but also requires "that any challenge must be based on the sufficiency of the complaint," *see SPL Shipping Ltd.* v. *Gujarat Cheminex Ltd.*, No. 06 Civ. 15375 (KMK), 2007 WL 831810, at *3 (S.D.N.Y. Mar. 15, 2007), while the reasonable grounds standard allows for review of any additional evidence submitted by the parties, *see Emeraldian Ltd. P'ship* v. *Wellmix Shipping Ltd.*, No. 08 Civ. 2991 (RJH), 2009 WL 3076094, at *3 (S.D.N.Y. Sept. 28, 2009) (quoting *Wajlam Exports (Singapore) Pte. Ltd.* v. *ATL Shipping Ltd.*, 475 F. Supp. 2d 275, 278-89 (S.D.N.Y. 2006).  The Second Circuit, for its part, has held that a district court did not abuse its discretion when it vacated attachments in reliance on evidence going beyond the pleadings.  *See Williamson* v. *Recovery Ltd. P'ship*, 542 F.3d 43, 53 (2d Cir. 2008).

Regardless of the standard, a plaintiff's complaint must meet the heightened pleading standard of Supplemental Rule E(2), which requires that the complaint "state the circumstances from which the claim arises with such particularity that the defendant or claimant will be able, without moving for a more definite statement, to commence an investigation of the facts and to frame a responsive pleading."  *Beluga Chartering GMBH* v. *Korea Logistics Sys., Inc.*, 589 F. Supp. 2d 325, 327 (S.D.N.Y. 2008) (quoting *Padre Shipping*, 553 F. Supp. 2d at 332).

### 2. Plaintiff Has Failed to State a Valid *Prima Facie* Admiralty Claim

Plaintiff's SAVC only alleges one "cause of action": a claim for attachment of Defendants' assets. (SAVC ¶¶ 71-77). This alone may be enough to vacate the prior orders of attachment, for, as Defendants note (Def. Br. 6), Supplemental Rule B attachment is a remedy, not a claim. *See Al Fatah Int'l Nav. Co.* v. *Shiysu Canadian Clear Waters Tech. (P) Ltd.*, 649 F. Supp. 2d 295, 300 (S.D.N.Y. 2009) ("Rule B itself does not provide the basis for determining the existence of a valid prima facie admiralty claim."); *Sonito Shipping Co., Ltd.* v. *Sun United Maritime Ltd.*, 478 F. Supp. 2d 532, 536 (S.D.N.Y. 2007) (noting that the Supplemental Rules create procedures for attachment, but "[n]either Rule B nor any other of the Supplemental Rules create 'a valid prima facie admiralty claim'"). Plaintiff asserts that it has stated a claim for wrongful arrest (Pl. Opp. 11), but cites no authority to support why the Court should divine from the SAVC a claim that has not been clearly stated —especially when Plaintiff is a sophisticated party with the benefit of counsel and multiple iterations of amendment to its pleadings. On this point alone, then, the Court might be warranted in finding that Plaintiff has failed to meet its burden. Nevertheless, the Court will proceed with its analysis as if Plaintiff has brought claims other than its stated "cause of action" for Supplemental Rule B attachment.

Reading the SAVC generously, Plaintiff has asserted wrongful arrest claims against FG Nigeria and Opah, and has alleged that FG USA is liable for its co-defendants' actions through alter ego liability. (SAVC ¶¶ 31-55). Neither

side contests that a claim for wrongful arrest sounds in admiralty, as it clearly does. *See Sea Trade Mar. Corp.* v. *Coutsodontis*, No. 09 Civ. 488 (BSJ) (HBP), 2012 WL 3594288, at *6 (S.D.N.Y. Aug. 16, 2012). However, neither side devotes much energy to arguing whether Plaintiff has in fact adequately alleged a *prima facie* claim of wrongful arrest against FG Nigeria and Opah. (*See* Def. Br. 8; Pl. Opp. 11). Instead, the parties focus their analyses on whether Plaintiff has adequately alleged alter ego liability. (*See* Def. Br. 8-13; Pl. Opp. 11-16). Accordingly, the Court will assume without deciding that Plaintiff has adequately alleged a *prima facie* claim of wrongful arrest, as the resolution of that issue is not central to the Court's decision.

Instead, the Court turns to whether Plaintiff has alleged a valid *prima facie* admiralty claim via alter ego liability. Like Supplemental Rule B attachment, alter ego liability is not a claim in and of itself. Instead, it is a theory of liability that allows courts, in situations where entities are acting as mere alter egos of one another, instead of separate corporations, to ignore the existence of the corporate form and "pierce the corporate veil." *See* 18 C.J.S. CORPORATIONS § 23. However, "alter-ego theories of liability are prima facie admiralty claims so long as the underlying claim arose in admiralty." *Pink Goose (Cayman) Ltd.* v. *Sunway Traders LLC*, No. 08 Civ. 2351 (HB), 2008 WL 4619880, at *2 (S.D.N.Y. Oct. 17, 2008). As already discussed, there is no question that Plaintiff's wrongful arrest claim, at minimum, arises in admiralty. Therefore, the Court is left to determine whether Plaintiff has adequately alleged alter ego liability.

As it happens, Plaintiff has not.  But, before getting to the merits of Plaintiff's alter ego allegations, the Court must first determine which substantive law will govern the Court's analysis.  *See Blue Whale Corp.* v. *Grand China Shipping Dev. Co.*, 722 F.3d 488, 495 (2d Cir. 2013) ("Assessing the prima facie validity of a claim is a substantive inquiry that should be governed by the relevant substantive law.").  Under Second Circuit precedent, this Court must "ascertain and value points of contact between the transaction and the states or governments whose competing laws are involved."  *British Marine PLC* v. *Aayanti Shipping & Chartering Ltd.*, No. 13 Civ. 839 (BMC), 2013 WL 6092821, at *5 (E.D.N.Y. Nov. 19, 2013) (internal brackets omitted) (quoting *Blue Whale*, 722 F.3d at 498).

Here, as in *Blue Whale* and *British Marine*, the analysis indicates that federal common law should apply.  Similarly to both cases, "the relevant transaction to plaintiff's cause of action is plaintiff's attempt to pierce the corporate veil," and not any underlying claim.  *See id.*  Additionally, Plaintiff initiated this proceeding here and has successfully attached Defendants' property here.  *See id.*  Finally, and in contrast to *Blue Whale* and *British Marine*, there is overwhelming weight in support of the application of United States law, given that three of the four parties to this action are based in the United States.  *See id.* (applying federal common law where the parties were split between the United Kingdom, India, and Hong Kong, and thus there was an "absence of a dominant foreign choice of law").  Thus, "given the presence of defendants' property in this district, plaintiff's choice of forum, and the absence

13

of a strong connection between this action and any single foreign jurisdiction, federal common law has the strongest 'points of contact' to plaintiff's alter ego claim." *Id.*[4]

Having determined that the relevant substantive law for Plaintiff's alter ego allegations is federal common law, the Court next analyzes whether Plaintiff has met its burden of alleging a valid *prima facie* claim. "Under federal common law, courts are reluctant to pierce a corporate veil and impose liability on a separate, related entity, but may do so under extraordinary circumstances." *Clipper Wonsild Tankers Holding A/S* v. *Biodiesel Ventures, LLC*, 851 F. Supp. 2d 504, 509 (S.D.N.Y. 2012). In order to assert alter ego liability, "a plaintiff must show that an alter ego was used to perpetrate a fraud *or* was so dominated and its corporate form so disregarded that the alter ego primarily transacted another entity's business rather than its own corporate business." *Id.* (internal quotation marks and brackets omitted) (quoting *Kirno Hill Corp.* v. *Holt*, 618 F.2d 982, 985 (2d Cir. 1980)). The alter ego analysis is necessarily fact-specific, but there are several factors courts look to in determining whether a defendant is an alter ego of another. *See id.* Those factors — none of which is dispositive — include:

> [i] [D]isregard of corporate formalities; [ii] inadequate capitalization; [iii] intermingling of funds; [iv] overlap in ownership, officers, directors, and personnel;

---

[4]     Defendants' argument that the Court should apply Texas state law as opposed to federal common law falls flat (*see* Def. Br. 8-10), as the Second Circuit has made clear that "[w]hen the choice is between state law and federal common law, the federal interest in maintaining uniformity in the quintessentially federal realm of admiralty supersedes any competing interest in applying state law," *Blue Whale Corp.* v. *Grand China Shipping Dev. Co.*, 722 F.3d 488, 497 (2d Cir. 2013).

[v] common office space, address[,] and telephone numbers of corporate entities; [vi] the degree of business discretion shown by the allegedly dominated corporation; [vii] whether the dealings between the entities are at arm[']s length; [viii] whether the corporations are treated as independent profit centers; [ix] payment or guarantee of the corporation's debts by the dominating entity[;] and [x] intermingling of property between the entities.

*Id.* at 509-10.

Plaintiff's allegations supporting alter ego liability are that FG USA and FG Nigeria "have common ownership, and common directors" (SAVC ¶ 44); that they "maintain a single website … and a common LinkedIn page" (*id.* at ¶ 45); and that Eric Opah is the president, CEO, director, and founder of both FG USA and FG Nigeria (*id.* at ¶ 46). Other than that, the SAVC contains merely conclusory allegations, such as that FG USA "was formed to carry out the business of" FG Nigeria (*id.* at ¶ 49); that "Opah created and operated [FG USA] … to cause the wrongful arrest of the SEA HORIZON and avoid accountability for the same" (*id.* at ¶ 50); and that FG Nigeria and Opah "are utilizing the corporate form of [FG USA] to hide behind their malicious and spurious actions in Ghana" (*id.* at ¶ 51). All of these allegations are made solely upon information and belief. (*Id.* at ¶¶ 49-51). Outside of its pleading, Plaintiff also asks the Court to consider certain email exchanges indicating coordination between FG Nigeria and FG USA on certain business matters. (Pl. Opp. 15).

Given the reluctance with which courts pierce the corporate veil and the particularity of allegations required by Supplemental Rule E(2), the Court finds

that these allegations do not meet the standard of a valid *prima facie* admiralty claim. At best, Plaintiff has alleged that FG Nigeria and FG USA share an owner/director, a website, and a LinkedIn page, and that employees of the two companies have, on one occasion, coordinated on business matters. Plaintiff admits that the two companies do not share a physical location (SAVC ¶¶ 3-4), nor does it allege that, apart from Opah, they share the same personnel or contact information. And unlike other cases in which sister courts have found that alter ego liability was adequately pleaded, *see, e.g., Goodearth Mar. Ltd.* v. *Calder Seacarrier Corp.*, No. 08 Civ. 2028 (RMB), 2008 WL 2856533, at *2 (S.D.N.Y. July 21, 2008); *C. Transp. Panamax, Ltd.* v. *Kremikovtzi Trade E.O.O.D.*, No. 07 Civ. 893 (LAP), 2008 WL 2546180, at *4 (S.D.N.Y. June 19, 2008); *Brave Bulk Transp. Ltd.* v. *Spot On Shipping Ltd.*, No. 07 Civ. 4546 (CM), 2007 WL 3255823, at *5 (S.D.N.Y. Oct. 30, 2007), there is no allegation that either corporation acted as a paying agent or satisfied the debts or obligations of the other. Accordingly, for the various reasons provided above, the Court finds that Plaintiff has failed to allege any valid *prima facie* admiralty claim, and therefore the order of attachment should be vacated.

### 3. Plaintiff Has Failed to Establish That Defendants' Assets Are in This District

As a second reason for vacating this Court's prior orders of attachment, Defendants argue that they have no property within this District that can be attached (Def. Br. 13-16), thereby precluding Plaintiff from satisfying the third prong of *Aqua Stoli*. *See* 460 F.3d at 445. Although Defendants acknowledge that funds they hold at Wells Fargo have been attached via that bank's branch

in Manhattan, they assert that those accounts are actually located at Wells Fargo branches in Texas.  (Def. Br. 13).[5]  Moreover, Defendants argue that under New York's "separate entity" rule, the funds held in a Texas bank branch cannot be considered as being held by any branch in New York, and therefore those funds are not located in this District.  (*Id.* at 14).

As a preliminary matter, the Court credits Defendants' claim that the Wells Fargo accounts at issue here were opened at, and are operated from, branches in Houston, Texas, and Humble, Texas.  (*See* DeLong Decl. ¶¶ 4, 7-9; Opah Decl. ¶ 3).  Plaintiff has offered nothing to counter Defendants' assertion that their accounts are located in Texas apart from noting that Wells Fargo duly attached Defendants' funds in response to this Court's attachment orders. (Pl. Opp. 17-18).  On this point, however, the Court agrees with Defendants that Wells Fargo's compliance with the Court's orders is more likely indicative of Wells Fargo exercising caution rather than an implicit confirmation that Defendants have accounts at branches in the Southern District of New York. (Def. Reply 6-7).  The Court therefore conducts its analysis based on a finding that the Wells Fargo accounts at issue originate from branches in Texas.

The Court finds that, under New York's "separate entity" rule, Defendants' property at Wells Fargo is not located in this District.  "The separate entity rule … provides that even when a bank garnishee with a New

---

[5]     Specifically, FG USA admits to holding three accounts at Wells Fargo — one opened at a branch in Houston, Texas, and the other two opened at a branch in Humble, Texas (DeLong Decl. ¶ 4), while Opah admits to holding a single account at a branch in Houston (Opah Decl. ¶ 3).

York branch is subject to personal jurisdiction, its other branches are to be treated as separate entities for certain purposes." *Motorola Credit Corp.* v. *Standard Chartered Bank*, 24 N.Y.3d 149, 158 (2014).[6] Relevantly, the separate entity rule means that "a restraining notice or turnover order served on a New York branch will be effective for assets held in accounts at that branch but will have no impact on assets in other branches." *Id.* at 159. The Second Circuit has expressly relied upon on the separate entity rule in the context of maritime attachment, holding that an order of attachment served on a bank branch located in the Eastern District of New York was not effective as to assets located at a branch in the Southern District of New York. *See Bergenske Dampskibsselskab* v. *Sabre Shipping Corp.*, 341 F.2d 50, 53-54 (2d Cir. 1965). Plaintiff argues, however, that the separate entity rule no longer exists, relying in part on *Digitrex, Inc.* v. *Johnson*, 491 F. Supp. 66 (S.D.N.Y. 1980), and that therefore the Second Circuit's holding in *Sabre Shipping* does not control. (Pl. Opp. 19-20).

It is true that the district court in *Digitrex* expressed its belief that the separate entity rule was no longer valid, relying in part on the court being unable to find any recent cases from New York appellate courts reaffirming the rule. *See* 491 F. Supp. at 68. However, the *Digitrex* court's analysis, and any argument made in reliance on it, is fatally undermined by the fact that the New

---

[6]       Given the dearth of federal maritime law on the subject of whether a party's assets in a bank branch outside of the relevant district are subject to attachment, New York State law controls. *See Shipping Corp. of India* v. *Jaldhi Overseas Pte Ltd.*,  585 F.3d 58, 70 (2d Cir. 2009).

York Court of Appeals expressly reaffirmed the separate entity rule's vitality in *Motorola* in 2014. *See* 24 N.Y.3d at 162 (declining appellant's "invitation to cast aside the separate entity rule," and instead finding that "the underlying reasons that led to the adoption of the separate entity rule still ring true today"). Therefore, the question is not whether the separate entity rule still exists or not — it clearly does — the question is whether the rule, as reaffirmed by the Court of Appeals, controls the facts in this case.

The Court concludes that it does. Of course, one could challenge *Motorola*'s application to this case by arguing that the Court of Appeals only addressed the narrow question of whether the single entity rule barred the restraining of assets in bank branches outside the United States. *See* 24 N.Y.3d at 159 n.2. Indeed, the Court of Appeals specifically discussed the separate entity rule in the context of international banking, instead of focusing on domestic banking. *See id.* at 162.[7] However, the logic of *Motorola* applies with similar force to domestic banks and their branches. As with international bank branches, branches located in different states are exposed to liability in legally distinct jurisdictions, are subject to different legal and regulatory regimes, and may not necessarily have access to one another's information. Although it is clear in this case that Wells Fargo's branch in New York was sufficiently connected to its branches in Texas as to be able to attach

---

[7] The Court of Appeals noted that the rule's benefits include ameliorating the risk of double liability in separate jurisdictions, different branches being subject to different legal and regulatory regimes, and practical constraints and costs associated with making one branch accountable for all others. *See Motorola Credit Corp.* v. *Standard Chartered Bank*, 24 N.Y.3d 149, 162 (2014)

Defendants' assets there, the Court does not believe that sole fact, given the other considerations expressed by the *Motorola* court, is enough to preclude application of the separate entity rule here.

The Court notes that it is not alone in finding the separate entity rule applicable to the domestic banking context following *Motorola*. Although not addressing maritime attachment, the court in *Baltazar* v. *Houslanger and Associates, PLLC* found that, due to the separate entity rule, a restraining notice served on a Bank of America branch in Utica, New York, had no effect on funds located in a branch in New Jersey. *See* No. 16 Civ. 4982 (JMA) (AKT), 2018 WL 3941943, at *11 (E.D.N.Y. Aug. 16, 2018), *report and recommendation adopted*, 2018 WL 4781143 (E.D.N.Y. Sept. 30, 2018). That said, the Court also acknowledges that the First Department has addressed the separate entity rule following *Motorola* and has described the case's holding in narrow terms. *See B & M Kingstone, LLC*, v. *Mega Int'l Commercial Bank Co.*, 15 N.Y.S.3d 318, 323 (1st Dep't 2015) (writing that the Court of Appeals had recently upheld the continuing validity of the rule "solely with respect to restraining notices and turnover orders affecting assets located in foreign branch accounts"). The Court does not disagree that *Motorola's* holding was so limited, but believes that the holding was so limited because only that narrow issue had been certified to the Court of Appeals. Thus, the Court does not believe that the Appellate Division's decision forecloses this Court's finding. The Court also believes *B & M Kingstone* to be particularly inapposite because the court there dealt with whether a court could compel a response to an information

20

subpoena, not whether a court could attach assets. *See id.* at 266. Given the continuing vitality of the separate entity rule and the lack of any authority counseling against its application to the domestic context, the Court finds that its prior attachment of Defendants' funds via Wells Fargo's Manhattan branch was improper, because the separate entity rule dictates that Defendants' funds are located in Texas.[8] This provides an independent reason for why the prior orders of attachment should be vacated.

### 4. This Case Is Subject to Equitable Vacatur

As a final ground for vacatur, Defendants argue that the Court should exercise its discretionary power to equitably vacate the prior attachment orders. (Def. Br. 16-21). Plaintiff, for its part, entirely fails to address this portion of Defendants' argument. *Cf. Jackson* v. *Fed. Exp.*, 766 F.3d 189, 198 (2d Cir. 2014) ("[I]n the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned."). Regardless, it is clear that this case is a candidate for equitable vacatur.

As the Court has already discussed, a district court may vacate an attachment if a defendant can show either that the defendant is subject to suit in a convenient adjacent jurisdiction or that the plaintiff could obtain *in*

---

[8]     For completeness, the Court also acknowledges that a district court in the District of Arizona has expressed the opinion that, under *Motorola*, "the separate entity rule only applies to accounts in foreign branches." *Wells Fargo Bank NA* v. *Wyo Tech Inv. Grp. LLC*, No. 17 Civ. 4140 (PHX) (JJT), 2018 WL 3648417, at *3 (D. Ariz. Aug. 1, 2018). The Court respectfully disagrees with that court's interpretation of *Motorola*, finding it to be an over-reading of the New York high court's decision.

*personam* jurisdiction over the defendant in a district where the plaintiff is located. *Aqua Stoli*, 460 F.3d at 445. This concept of equitable vacatur exists because "the ability of the court to exercise *in personam* jurisdiction over the defendant satisfies the plaintiff's needs for assurance that it will be able to call the defendant into court to satisfy a judgment." *Emerald Equip. Leasing, Inc.* v. *Sea Star Line, LLC*, No. 08 Civ. 10672 (JGK), 2009 WL 1182575, at *4 (S.D.N.Y. May 1, 2009) (quoting *Swiss Marine Servs. S.A.* v. *Louis Dreyfus Energy Servs. L.P.*, 598 F. Supp. 2d 414, 421 (S.D.N.Y. 2008)). Indeed, "security cannot be obtained except as an adjunct to obtaining jurisdiction." *Id.* at *5 (quoting *Seawind Compania, S.A.* v. *Crescent Line, Inc.*, 320 F.2d 580, 582 (2d Cir. 1963)).

Plaintiff cannot argue that there does not exist a different district in which Defendants would have been subject to suit. Prior to filing the instant action, Plaintiff had an active case against Defendants in the Southern District of Texas (Def. Br. 3), where FG USA and Opah are both indisputably located (SAVC ¶¶ 4-5). And yet despite clearly having personal jurisdiction at least as to FG USA and Opah, Plaintiff went to a different district to attach Defendants' assets. *See Aqua Stoli*, 460 F.3d at 444-45 ("A maritime attachment would … be properly vacated if the plaintiff and defendant are both present in the same district and would be subject to jurisdiction there, but the plaintiff goes to another district to attach the defendant's assets."). Thus, vacatur is warranted here.

Of course, the Court acknowledges that the facts before it do not neatly

fall into either of the two vacatur categories previously discussed. It is not

obvious that the "convenient adjacent jurisdiction" category applies here — the

paradigmatic example of a "convenient adjacent jurisdiction" is an "across the

river" case, such as the Southern and Eastern Districts of New York, and the

Second Circuit has said that "[i]t is less clear … that a district court could

vacate an attachment on convenience grounds where the adjacent district is

more remote and therefore less obviously 'convenient' to the plaintiff." *Id.* at

444. It is similarly not obvious that the second category applies, as FG Nigeria

disputed throughout the course of the Texas action that it was subject to *in

personam* jurisdiction in Texas.

Nevertheless, the Court believes, based on its reading of *Aqua Stoli* and

its sister courts' decisions, that neither of these facts is a barrier to the exercise

of equitable vacatur. As to the first category, the Court notes that while the

concept of what makes a convenient adjacent jurisdiction "is a narrowly

circumscribed one," *id.*, it assuredly includes districts where Plaintiff itself

chose to bring suit. The Court is not alone in coming to this conclusion. *See

China Nat. Chartering Corp.* v. *Pactrans Air & Sea Inc.*, 589 F. Supp. 2d 403,

405-06 (S.D.N.Y. 2008) (finding that the Northern District of Florida qualified

as a convenient district, and stating that "Pactrans cannot be heard to

complain of any inconvenience of litigating in the Northern District of Florida

inasmuch as it chose to file its own action … there"); *but see Milestone

Shipping, S.A.* v. *Estech Trading LLC*, 764 F. Supp. 2d 632, 637 (S.D.N.Y. 2011)

(finding that Ohio could not be considered a convenient adjacent district to the Southern District of New York given their geographical separation).

As to the second category, it is indisputable that, were Plaintiff to bring suit against Defendants in the Northern District of Texas, the court there would be able to exercise *in personam* jurisdiction over FG USA and Opah, given that the former is incorporated in Texas and the latter is domiciled there. *Cf. Daimler AG* v. *Bauman*, 571 U.S. 117, 122 (explaining that a court may exercise personal jurisdiction over foreign corporations that are "at home" in the forum State). It is less clear, however, that the court would be able to exercise personal jurisdiction over FG Nigeria. Plaintiff alleges that FG Nigeria and FG USA are alter egos of one another (SAVC ¶¶ 44-55), and "[w]here one defendant is subject to personal jurisdiction …, its alter egos are subject to personal jurisdiction," *Glory Wealth Shipping Pte Ltd.* v. *Indus. Carriers, Inc.*, 590 F. Supp. 2d 562, 564 (S.D.N.Y. 2008). Of course, FG Nigeria's and FG USA's alter ego status is merely alleged, not proven. However, Plaintiff cannot have it both ways: Either Defendants are alter egos of one another — in which case FG Nigeria is subject to personal jurisdiction in the Northern District of Texas and equitable vacatur is appropriate — or Defendants are not alter egos of one another and Plaintiff has therefore failed to state a valid *prima facie* admiralty claim. Regardless of which path the Court chooses, the destination remains vacatur. *See id.* (finding vacatur appropriate because either defendant was an alter ego, and therefore was found in the district, or was not an alter

ego, and therefore there was no valid *prima facie* admiralty claim).  Therefore, equitable vacatur is appropriate here.

In summary, the Court's prior orders of attachment are subject to vacatur for multiple reasons.  *First*, Plaintiff has failed to state a valid *prima facie* admiralty claim, primarily because Plaintiff has failed to allege adequately alter ego liability.  *Second*, Plaintiff has failed to show that Defendants' assets are located in this District because the separate entity rule bars attachment of funds located in bank branches outside the District.  Finally, even if Plaintiff had met its burden to maintain the attachment, Defendant has adequately shown that this case is subject to equitable vacatur.  The Court therefore grants Defendants' motion to vacate the prior orders of attachment, and denies as moot their alternative motion to transfer this action.

## CONCLUSION

For the reasons set forth in this Opinion, Defendants' motion to vacate the prior orders of attachment (Dkt. #3, 11, and 14) is GRANTED.  The prior orders of attachment are vacated and the SAVC is dismissed.  Plaintiff, and all garnishees, are directed to release Defendants' attached assets immediately, and Plaintiff is barred from seeking further attachment of Defendants' assets pursuant to the vacated orders.

The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:  March 26, 2020
        New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge